**CRIMINAL COMPLAINT**

ORIGINAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA v. ALFRED NASH VILLALOBOS | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO. 09- **09-1664M** |

Complaint for violation of Title 18 United States Code § 1503.

| NAME OF MAGISTRATE JUDGE THE HONORABLE FREDERICK F. MUMM | UNITED STATES MAGISTRATE JUDGE | LOCATION Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE July 30, 2009 | PLACE OF OFFENSE Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) 23705 Vanowen St., No. 252, West Hills, CA 91307 |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE VIOLATION:

On or about July 30, 2009, defendant ALFRED NASH VILLALOBOS, in Los Angeles County, within the Central District of California, and elsewhere, corruptly endeavored to influence, obstruct, and impede the due administration of justice in an investigation before a federal grand jury sitting in the Central District of California by soliciting cash payments totaling $107,000, from the target of the investigation, in exchange for an agreement that VILLALOBOS' client, O.A., would make false statements to an Assistant United States Attorney and would testify falsely before the grand jury, in violation of Title 18, United States Code, Section 1503.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT JOY MITCHELL |
|---|---|
| | OFFICIAL TITLE SPECIAL AGENT FEDERAL BUREAU OF INVESTIGATION |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE August 4, 2009 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54

JOSEPH N. AKROTIRIANAKIS, Assistant United States Attorney          REC: Detention

<u>A F F I D A V I T</u>

I, JOY MITCHELL, being duly sworn, declare and state:

1.    I am a Special Agent ("SA") of the United States Department of Justice, Federal Bureau of Investigation ("FBI") and have been so employed since November 2005.  My duties as an FBI SA include the investigation of public corruption matters and other suspected violations of federal law, such as perjury, obstruction of justice, corruption of public officials, and fraud against the government.  As an FBI SA, I have employed various investigative techniques, including physical surveillance, consensual recordings, interviews, and the use of confidential sources and cooperating witnesses.

<u>BASIS OF FACTS STATED IN AFFIDAVIT</u>

2.    This affidavit is based upon my personal knowledge, derived from my participation in this investigation and upon information from the following sources, which I believe to be reliable:

a.    Oral and written reports about this investigation from FBI agents and other law enforcement officers;

b.    Physical surveillance conducted by me or law enforcement officers whose observations have been reported to me directly or indirectly;

c.    The statements of cooperating witnesses made to me or reported to me directly or indirectly;

-1-

d.   The content of recorded voicemail messages and consensually recorded conversations obtained through a cooperating witness[1]; and

e.   Other notes and documents provided by a cooperating witness.

PURPOSES OF AFFIDAVIT

3.   This affidavit is in support of a complaint against, and for a warrant for the arrest of, ALFRED NASH VILLALOBOS ("VILLALOBOS"), for endeavoring to obstruct justice, in violation of 18 U.S.C. § 1503.  As set forth below, there is probable cause to believe that VILLALOBOS had violated 18 U.S.C. § 1503.

4.   This affidavit is also made in support of a search warrant for VILLALOBOS' AT&T BlackBerry handheld computer ("SUBJECT BLACKBERRY").  As set forth herein, there is probable cause to believe that the SUBJECT BLACKBERRY contains evidence of violations of 18 U.S.C. § 1503.

5.   The recitation of facts contained herein is intended to set forth sufficient probable cause to support a complaint against VILLALOBOS and for the requested search warrant.  This affidavit is not intended to be an exhaustive recitation of all

---

[1]  Where this affidavit indicates that a voicemail message or conversation was recorded, I have reviewed those recordings except where otherwise indicated.  Parenthetical references within the quotations taken from the recordings are my interpretation of the recordings in light of my background in this investigation.

-2-

facts relevant to the investigation or those known to law enforcement, and it does not purport to set forth all of my knowledge of, or investigation into, the matters discussed herein.

PREMISES TO BE SEARCHED

6.   The premises to be searched are described in Attachment A and as follows:

One AT&T Blackberry handheld computer, linked to email address nashvilla333@yahoo.com and believed to be used by Alfred Nash Villalobos

ITEMS TO BE SEIZED

7.   The items to be seized are described in Attachment B and as follows:

a.   The SUBJECT BLACKBERRY.

b.   All records, documents, programs, applications or materials, including all recoverable email, text, and voicemail messages, in sent, received, or draft form, contained on the SUBJECT BLACKBERRY, which discuss, describe, or relate to VILLALOBOS' obstruction or endeavored obstruction of justice in connection with the grand jury investigation described in this affidavit.

c.   The SUBJECT BLACKBERRY's address book, call logs, and call histories, including call logs and call histories for incoming, outgoing, and missed calls.

-3-

d.   As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form, including in digital form on any digital device, such as the SUBJECT BLACCKBERRY.  The term "digital device" includes any electronic device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants and handheld devices; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media; and security devices.

e.   In searching for data capable of being read, stored or interpreted by a digital device, law enforcement personnel executing this search warrant will employ the following procedure, subject to the additional procedures outlined herein under the heading "Procedures to Minimize Disclosure of Privileged Material":

i.   In searching the digital device, the computer personnel may examine all of the data contained in the digital device to view their precise contents and determine whether the digital device and/or data falls within the items to be seized as

-4-

set forth herein.   In addition, the computer personnel may search
for and attempt to recover "deleted," "hidden" or encrypted data
to determine whether the data falls within the list of items to
be seized as set forth herein.

       ii.   The computer personnel will initially search
the digital device within a reasonable amount of time not to
exceed 60 days from the date of execution of the warrant.   If,
after conducting such an initial search, the case agents
determine that a digital device is an item to be seized or
contains any data falling within the list of items to be seized
pursuant to this warrant, the government will retain the digital
device for further analysis; otherwise, the government will
return the digital device.   If the government needs additional
time to determine whether the digital device is an item to be
seized or contains any data falling within the list of items to
be seized pursuant to this warrant, it may seek an extension of
the time period from the Court within the original sixty day
period from the date of execution of the warrant.

       f.   In order to search for data that is capable of
being read or interpreted by a digital device, law enforcement
personnel will need to seize and search the following items,
subject to the procedures set forth above:

       i.   Any digital device capable of being used to
commit, further or store evidence of the offense listed above;

-5-

ii.   Any equipment used to facilitate the transmission, creation, display, encoding or storage of digital data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices and optical scanners;

iii. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones and personal digital assistants;

iv.   Any documentation, operating logs and reference manuals regarding the operation of the digital device or software used in the digital device;

v.   Any applications, utility programs, compilers, interpreters and other software used to facilitate direct or indirect communication with the digital device;

vi.   Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

vii. Any passwords, password files, test keys, encryption codes or other information necessary to access the digital device or data stored on the digital device.

-6-

STATEMENT OF PROBABLE CAUSE

8.   VILLALOBOS is an attorney first admitted to the State Bar of California on December 31, 1997.[2]

9.   Federal law provides that certain persons engaged in religious occupation may obtain either temporary nonimmigrant or legal permanent resident visas (collectively "religious worker visas").

10.  On or about July 15, 2009, the United States Attorney's Office for the Central District of California informed FBI SA Gary Bennett, who in turn informed me, that a grand jury sitting in the Central District of California was conducting a criminal investigation of Confidential Witness One ("CW1"), who runs a religious-based outreach, educational, and social service organization in Los Angeles, California ("Organization").  The grand jury investigation was at least partially overt prior to July 15, 2009.  Grand jury subpoenas had been served, and witnesses had been interviewed regarding CW1 and the religious worker visas obtained by individuals ("purported religious workers") based on asserted employment by the Organization.

11.  The grand jury investigation of CW1 involves a suspected religious worker visa fraud scheme believed to have

---

[2]  According to the State Bar of California's website, www.calsb.org, VILLALOBOS has been licensed and eligible to practice law since this date, with the exception of three periods of ineligibility during the years 2004 through 2007.  The three periods of ineligibility total fewer than three months.

operated in the following manner:

       a.   CW1 would permit the purported religious workers to claim to be employed by the Organization.

       b.   The purported religious workers would obtain religious worker visas based on their asserted employment by the Organization.

       c.   The purported religious workers did little or no work for the Organization.  CW1 would nonetheless issue paychecks to the purported religious workers to make it appear that the purported religious workers were full time employees of the Organization and thereby maintain their religious worker status and their religious worker visas.

       d.   The purported religious workers would repay the amount of their paychecks to CW1 in cash.

   12.  A central issue in the grand jury investigation of CW1 is whether CW1 and the Organization provided false proof of employment to assist immigrants in fraudulently obtaining religious worker visas.

   13.  Confidential Witness Two ("CW2") is an attorney licensed to practice law in the State of California.  CW2 represents CW1 in the grand jury investigation of CW1.

   14.  By mid-July 2009, several potential witnesses had been contacted as part of the grand jury's investigation of CW1. These potential witnesses included one of VILLALOBOS' clients,

-8-

Client One.   Client One was a purported religious worker who obtained a religious worker visa by claiming employment by the Organization.  As of the time of the filing of this affidavit, Client One has neither testified before the grand jury investigating CW1 nor been interviewed by the Assistant United States Attorney conducting the grand jury investigation of CW1 ("AUSA1").  Prior to mid-July 2009, however, AUSA1 had made efforts to interview Client One in anticipation of Client One testifying before the grand jury.  AUSA1's attempt to interview Client One and/or question Client One before the grand jury had been forestalled by VILLALOBOS, who had requested (and received) an extension from AUSA1.

15.  On or about July 15, 2009, FBI agents interviewed CW2. I have reviewed reports of this interview and have learned that, based upon his recollection, as refreshed by notes and other documents, CW2 indicated the following:

a.   VILLALOBOS is an attorney who represents Client One.

b.   VILLALOBOS first contacted CW1 by letter dated February 5, 2009 and printed on letterhead bearing VILLALOBOS' name, business address, the telephone number (818) 634-5986, and the email address nashvilla333@yahoo.com.  The letter indicated that VILLALOBOS represented Client One's spouse and that VILLALOBOS was contacting CW1 regarding issues arising from

Client One's employment by the Organization.   The letter requested that CW1 consult with his attorney concerning these "issues" so "that you (referring to CW1) understand the complete scope of consequences of your current course of action." VILLALOBOS indicated that he could be contacted at (818) 634-5986.

c.   On behalf of CW1, CW2 wrote to VILLALOBOS by letter dated February 23, 2009.   CW2's letter expressed confusion as to the nature of the "issues" referenced in VILLALOBOS' February 5, 2009 letter, given that no specific issue had been mentioned in that letter.   CW2 also inquired whether VILLALOBOS represented Client One, given that VILLALOBOS had only expressly indicated that he represented Client One's spouse.   CW2 also indicated that he was aware that some immigration visas related to the Organization were being investigated by federal authorities.

d.   VILLALOBOS responded to CW2's February 23, 2009 letter by a letter dated April 1, 2009.   In his April 1, 2009 letter, VILLALOBOS stated that he was representing Client One and pointed out that CW2 had "admitted" that his client (CW1) was the subject of an investigation by federal authorities.

e.   After these initial letters, conversations between CW2 and VILLALOBOS continued for weeks by telephone, e-mail, and one in-person meeting.   Throughout these discussions, VILLALOBOS

contended that Client One had in fact worked for the Organization and had been paid by CW1, but returned the money to CW1. According to CW2, VILLALOBOS stated that he had copies of tax forms showing wages earned by Client One for employment with the Organization. VILLALOBOS claimed that Client One had given $120,000 back to CW1 over the course of several years and, through VILLALOBOS, now demanded that amount from CW1. (Based on the evidence as a whole, it appears that Client One had, in fact, not worked for the Organization, at least not in any real or functional capacity. Client One had simply needed proof of employment with the Organization in order to maintain a religious worker visa, and Client One had returned the amount of his/her paychecks back to CW1.)

        f.   CW2 and VILLALOBOS met in person only once -- on May 18, 2009. VILLALOBOS showed CW2 copies of Client One's tax forms (but would not give CW2 copies) and did not have any documentation showing that Client One had returned any money to CW1. VILLALOBOS nonetheless contended that CW1 had forced Client One to return the amount of his/her paychecks to CW1, and stated the sum of the amounts returned was the amount VILLALOBOS now demanded from CW1 on behalf of Client One. In order to permit CW1 to resolve this "issue" without tacitly admitting that wages CW1 paid to a purported religious worker had been repaid to CW1, VILLALOBOS suggested that he and CW2 structure a settlement that

-11-

appeared to be the resolution of a sexual harassment claim.  (CW2 was not aware of any fact that would support a sexual harassment claim by Client One against CW1.)

g.   On July 13, 2009, VILLALOBOS began sending CW2 email from the email address nashvilla333@yahoo.com.  In an email dated July 13, 2009, VILLALOBOS notified CW2 that he and Client One were scheduled to meet with AUSA1 the following morning (July 14, 2009), and that it was in the "interest" of both CW1 and Client One to have a "clear understanding" of how CW1 would "accept responsibility" for his actions.  VILLALOBOS wrote that, otherwise, "tomorrow will be what it is for both ouir [sic] clients.  My clients are prepared to go wherever the truth takes them (here or [Client One's country of origin]) I hope [CW1] is as well."[3]  (It appears that VILLALOBOS is suggesting that Client One was prepared to tell AUSA1 that he/she had returned the amount of his/her paychecks to CW1 as part of a scheme to obtain a fraudulent religious worker visa.  This is based, in part, on VILLALOBOS' reference to Client One's country of origin.  That is, VILLALOBOS and Client One are aware that informing the government that Client One had returned the amount of his/her paychecks to CW1 as part of a scheme to obtain a fraudulent

---

[3]  This -- like most if not all email CW2 received from the nashvilla333@yahoo.com email account -- indicated that it had been sent from VILLALOBOS' AT&T BlackBerry, based on the inclusion of a "trailer" that read "Sent via BlackBerry by AT&T."

religious worker visa would result in Client One's religious
worker visa being rescinded because it had been procured by
fraud.  In other words, informing AUSA1 about a scheme to obtain
a fraudulent religious worker visa would negatively impact Client
One because it could subject Client One to deportation, but would
negatively impact CW1 even more so, because it could subject him
to criminal liability.)

      h.   In a later email also sent July 13, 2009,
VILLALOBOS wrote that Client One's meeting with AUSA1 was not
until Thursday, July 16, 2009, at 1:00 p.m., which allowed a
"little more time to reconcile this issue." VILLALOBOS wrote,
"If [CW1] could care less about a resolution, please inform me so
I can adjust my position accordingly." CW2 responded that
whatever discussions occurred between CW2 and VILLALOBOS, Client
One's statements to the government (AUSA1) should not be
influenced, and that Client One would be obligated to tell the
truth.

      16.  On July 16, 2009, at the request of SA Bennett, CW2
consensually recorded a telephone call received from VILLALOBOS
at approximately 9:40 a.m.  During the conversation, VILLALOBOS
stated that he wanted CW1's "bottom line." VILLALOBOS stated, "I
want to know if he is going to pay.  If he is not going to pay,
nothing you can say is gonna make me happy." VILLALOBOS also
indicated that he had spoken with AUSA1, and that he had been

able to delay AUSA1's interview of Client One.  VILLALOBOS
emphasized that he did not want CW1 "dragging his feet" on the
money for three or four days because AUSA1's interview of Client
One had been delayed.  VILLALOBOS and CW2 agreed to try and
arrange an in-person meeting for later that day or the following
day.  (It appears from this recording that VILLALOBOS wants CW1
to pay VILLALOBOS and Client One prior to Client One's meeting
with AUSA1.  It appears, therefore, that VILLALOBOS is suggesting
that what Client One says during his/her interview with AUSA1
would be dependant on whether or not CW1 pays the money
VILLALOBOS was demanding.)  VILLALOBOS and CW2 agreed to meet the
following day (July 17, 2009) to try and resolve this "issue"
between CW1 and Client One.

    17.  Late in the afternoon of July 17, 2009, CW2 and
VILLALOBOS met in person at CW2's office in the Century City area
of Los Angeles, California.  The meeting was surveilled by FBI
agents placed throughout CW2's office, and the meeting was audio
recorded.  The following is taken from the surveillance report,
CW2's statements following the meeting, and a review of a report
of the recorded conversation between CW2 and VILLALOBOS.

        a.  Prior to the meeting, CW2 received a voicemail
message from VILLALOBOS.  VILLALOBOS wanted to confirm that they
were "on the same page" before VILLALOBOS traveled to meet with
CW2.  VILLALOBOS left a call back telephone number of (818) 634-

5986, the same telephone number on the letterhead of the two letters sent by VILLALOBOS, as described above.

b.   FBI surveillance agents observed a Hispanic male (whom CW2 identified as VILLALOBOS) attend a meeting with CW2. SA Bennett overheard VILLALOBOS identify himself to a receptionist at CW2's law office.  SA Bennett has identified VILLALOBOS from a California Department of Motor Vehicles ("DMV") profile photograph.  (A copy of VILLALOBOS' DMV photograph is attached hereto as Attachment C.)

c.   During VILLALOBOS' subsequent meeting with CW2, CW2 indicated that CW1 did not have the kind of money that VILLALOBOS was demanding, but that there was a way for CW1 to get money from donors to the Organization.  VILLALOBOS said to CW2, "All I need to know is what we'll need [Client One] to say [to AUSA1] . . . if there is anything that can be shaded in a gray area, [Client One is] going to say it exactly the way [he/she] should say it . . . if there's anything [that Client One could say to 'help' CW1, Client One will] do it."

d.   VILLALOBOS and CW2 then went on to discuss how CW1 could make the payment VILLALOBOS was demanding, given that the Organization's accounting records would likely be reviewed by AUSA1.  CW2 voiced a concern that any payment to Client One from CW1 would be seen by the government as a pay off to a witness.

e.   VILLALOBOS suggested that CW2 could argue to the

-15-

government that CW1 and Client One never had an agreement that Client One would return to CW1 the amount of his/her paychecks, and that CW1 had simply persuaded Client One to return the money as a donation to the Organization. VILLALOBOS stated that he believed this argument was persuasive because is was plausible that an employee of a religious organization would donate money to the Organization. CW2 asked VILLALOBOS directly if Client One was, in fact, donating his/her wages to the Organization. VILLALOBOS replied, "No, that wasn't, [CW1] was straight pimpin' 'em, [CW1] was straight going 'boom, work here, I'll give you the money, give it back to me.'"

f.   CW2 then asked VILLALOBOS what Client One would say to AUSA1, assuming that CW1 paid the money VILLALOBOS was demanding. VILLALOBOS stated that Client One would say that he/she "worked there full time . . . got paid, and that's it." When CW2 asked if Client One was going to say he/she gave the money back, VILLALOBOS responded, "[Client One will] do it anyway we need to do it." VILLALOBOS said that Client One could say he/she was donating money to the Organization, "We can go anywhere with that."

g.   CW2 then asked VILLALOBOS what would happen if CW1 did not agree to pay VILLALOBOS and Client One the amount of money VILLALOBOS was demanding. VILLALOBOS replied that CW1 would be "throwing the dice when we get in front of [AUSA1] . . .

-16-

[CW1] is going to have to run the risk.  I'm not going to tell you what [Client One is] going to say."  VILLALOBOS indicated that he and CW2 could structure a resolution in any way necessary, but that VILLALOBOS and Client One wanted $100,000 in cash (with the remaining $20,000 be "paid" in donation receipts from the Organization).  VILLALOBOS also said that if the agreement did not need to be in writing, it did not have to be.  VILLALOBOS then said, "In other cases when people have needed to do something like hand me a bag with eighty-thousand dollars, I've taken it, dealt with it."  VILLALOBOS proposed that they could call the agreement a sexual harassment claim, and that because all they had was an employee/employer relationship to work with, it had to be something plausible.  VILLALOBOS explained that "the farther we go out of the universe, the more implausible it becomes.  The closer we keep it, more plausible it is."

h.   CW2 and VILLALOBOS continued to discuss what Client One would say in response to questioning by AUSA1.  CW2 emphasized that the government was attempting to determine whether CW1 had provided purported religious workers with false proof of employment to assist the workers in fraudulently obtaining religious worker visas.  VILLALOBOS indicated that Client One would simply not give AUSA1 straight answers and would instead go around and around saying, "[CW1] is the number one,

super great guy.  He's very tough, he's very good at business, [Client One is] not very good at business, [CW1] requires [Client One] to work [Client One's] ass off."  VILLALOBOS stated that since Client One could say these things through a translator, the process could be drawn out.  When CW2 asked VILLALOBOS whether Client One would say he/she gave back the money CW1 paid Client One, VILLALOBOS replied, "No.  Not if we don't want [him/her] to. . . . [Client One will] do whatever is we need."  VILLALOBOS then assured CW2 that Client One was "not going to make a mistake." Discussing what, if anything, Client One would tell AUSA1 about receiving a recent payment settlement from CW1, VILLALOBOS stated, "I don't give a shit what [AUSA1] threatens me or [Client One.  Client One] will never say a freakin' thing, and neither will I."

i.    VILLALOBOS parted with a request that further discussions with CW2 be conducted by telephone, and not by email, because the government "can't subpoena telephone conversations . . . you're on a hard-line, I'm on a cell-phone, there's no way anyone knows what you and I are talking about."  CW2 agreed to call VILLALOBOS in one hour with a decision.

18.  I have reviewed a report prepared by SA Bennett and, based thereon, learned that, approximately 49 minutes later, in the presence of FBI agents, CW2 made a recorded telephone call to VILLALOBOS at telephone number (818) 634-5986.  At the direction

-18-

of SA Bennett, CW2 informed VILLALOBOS that, among other things, CW1 would pay $100,000 in cash.

19.   On July 20, 2009, VILLALOBOS left a recorded message for CW2 at approximately 3:41 p.m., requesting a call back to discuss the timing of the events for the following week.

20.   On July 21, 2009, at approximately 11:40 a.m., CW2 made a consensually recorded telephone call to VILLALOBOS.  Based on my review of the recording, I have learned the following:

a.   VILLALOBOS told CW2 that he was in Hawaii, and that they had another issue to resolve before the agreement would be complete.  VILLALOBOS discussed the employment future of Client One, and the need for him/her to stay employed by the Organization in order to maintain a religious worker visa. VILLALOBOS wanted CW1 to pay Client One an additional year's salary that Client One would not pay back to CW1.  CW2 explained that up until that point, CW1 had not lost any money because Client One had returned to CW1 all the money CW1 had paid to Client One.  VILLALOBOS' new demand would cost CW1 $24,000 in addition to the $100,000 cash (and the $20,000 in donation receipts).  CW2 emphasized that Client One's employment with the Organization had never been bona fide and had always been simply a way of allowing Client One to obtain a religious worker visa. CW2 explained that Client One's work had no value to the Organization, which is why Client One had given the money back.

-19-

VILLALOBOS acknowledged that everything CW2 had said was correct. VILLALOBOS and CW2 did not agree on any solution at that point, but instead went on to discuss the $20,000 in charitable donation receipts. VILLALOBOS proposed that the Organization provide him a receipt for a painting he would donate. VILLALOBOS requested a $6,000 receipt for a painting VILLALOBOS described as being worth a "hundred bucks." VILLALOBOS and CW2 agreed to leave any discussion of the donations out of any paperwork.

      b.    CW2 asked VILLALOBOS what would happen if AUSA1 were to question Client One before the grand jury. CW2 indicated that he/she expected that AUSA1 would "test" Client One before the grand jury to see if his/her testimony would be different from what Client One said during an interview with AUSA1 (at which VILLALOBOS would be present). VILLALOBOS replied that Client One would not be able to contradict himself/herself, and would jeopardize himself/herself if, while testifying, if he/she contradicted statements made during a pre-testimony interview. VILLALOBOS said, "I have explained this very clearly. I've explained the delicacy of what we are doing, and the nature of making a mistake." VILLALOBOS went on to explain that he had spoken to both Client One and his/her spouse, and indicated that, by making a statement to the government, "You are in a position to jeopardize yourself, so you can't make a mistake." VILLALOBOS explained to CW2 that Client One understood this, and would not

-20-

make a mistake, especially since doing so would be contrary to Client One's "self-interest." VILLALOBOS assured CW2 that Client One would be "sterling in front of [AUSA1]," and that he/she would "be a perfect soldier . . . perfect." CW2 explained that a lot of people, including CW2, could be hurt if Client One did change his/her story. VILLALOBOS stated, "When I give my word to somebody that my client is in line, that has never been broken, ever."

c.   CW2 and VILLALOBOS continued to discuss Client One being interviewed by AUSA1 and testifying before the grand jury. VILLALOBOS again assured CW2 that Client One's statement in a pre-grand jury interview with AUSA1 (at which VILLALOBOS would be present) would be consistent with Client One's later grand jury testimony. CW2 then asked VILLALOBOS: "Your client is going to be asked, 'Was [Client One] paid?' Okay? 'Did [Client One] give the money back?' [He/she's] going to be asked that question. What's the answer going to be, assuming we have a deal?" VILLALOBOS responded, "No. [He/she] got paid." CW2 then clarified, "[He/she] got paid, and [he/she] didn't give the money back?" VILLALOBOS responded, "Yep." CW2 replied, "OK . . . and so [CW1] is going to say the same thing. Alright? Because we're really going out on a limb here, you understand? We got a meeting [with AUSA1] tomorrow. And I'm essentially putting everything we've got in your hands, Sir, because tomorrow [CW1]

at this meeting is going to say that same thing, because we can't contradict each other." VILLALOBOS replied, "OK."

        d.   VILLALOBOS and CW2 then discussed VILLALOBOS' desire to be paid $50,000 before Client One met with AUSA1, and $50,000 after.

        e.   Finally, CW2 informed VILLALOBOS that there was at least one other person ("Witness Three") who CW2 knew had been interviewed by the government in connection with the grand jury investigation of CW1, and that CW2 had no idea "what [Witness Three] said, but if [Client One] would be willing to say something about [Witness Three], that would be very helpful to us." VILLALOBOS immediately responded, "Give me the name." CW2 provided Witness Three's name and then added, "And I'm thinking of something like . . . you know '[Witness Three] said [he/she] was out to get CW1,' you know? Something like that." Making clear that he understood CW2's request, VILLALOBOS responded, "Oh, a vindictive ex-worker." VILLALOBOS went on to say, "Well, that's an additional term now, [CW2], I want to help you on that . . . Is there any way for you to help me with this extra year (referring to the extra year of pay VILLALOBOS proposed earlier in the conversation)." CW2 responded, "I'll tell you what. If you can do that (referring to having Client One fabricate evidence about Witness Three), I will . . . try my damned-est to make sure that happens (referring to Client One being "employed"

by Organization for an additional year).  I will tell my client that it is absolutely worth it for him/her.  VILLALOBOS responded, "OK.  Deal.  Make it happen."  CW2 requested confirmation, "If I can do that, can you make it happen (referring to having Client One fabricate evidence about Witness Three)?"  VILLALOBOS responded, "I'll guarantee you that's what will happen."

21.  On July 27, 2009, at approximately 3:15 p.m., CW2 made a consensually recorded telephone call to VILLALOBOS.  Based on my review of the recording, I have learned the following:

a.  CW2 told VILLALOBOS that he/she believed that the United States Attorney's Office must be subpoenaing additional records in CW1's case.  CW2 told VILLALOBOS, ". . . in light of that level of scrutiny, I don't want to wire you anything (referring to the initial $50,000 payment), okay?  Um . . . I will give you cash."  VILLALOBOS responded, "I like cash better."  After VILLALOBOS discussed his understanding of certain aspects of CW1's culture, he stated:

The bottom line is, the only way for this (referring to the federal criminal investigation of CW1) to go away is . . . [CW1] has to do what [CW1] has to do.  And in this situation, the only right thing to do is, is to pay (referring to CW1 paying VILLALOBOS and Client One $100,000 in exchange for false statements to AUSA1 and

-23-

false testimony before the grand jury) and be done with it. Now, however you want to deal with that part - it's fine with me. Like I said before, I have no problem coming into a room, taking a bag (referring to a bag of money), being done. People understand what will or will not be said. Uh, my word is good. I've never had somebody go back against my word. The bottom line is, that, [CW1] has . . . has trouble. I can deal with the trouble from my client (referring to Client One's contemplated false statements and false testimony), I cannot help [CW1] beyond what we've discussed (referring to CW1 paying VILLALOBOS $100,000 in exchange for Client One's false statements and false testimony) and that's [CW1's] problem. So, you know, coming back to your issue, I understand that [CW1] . . . . can . . . [CW1] may be in some jeopardy. I can only help you with my client, and I can do what I've already agreed to do. And as long as you keep your end of the bargain, I will keep my end of the bargain.

b.   As the conversation proceeded, CW2 expressed concern about the contemplated obstruction of justice coming to the government's attention: "Clients aside, I don't want to be on the hook here. Alright? I mean, in the end of the day, uh, uh . . . You know the movie, The Usual Suspects?" VILLALOBOS

responded, "Oh, yeah."  CW2 continued, "OK, so you know the, uh, the, uh, what's the guys' name?  The actor, Kevin Spacey, talking about that bad guy and he says that, uh, Keyser Soze, Keyser Soze, and he says that 'Keyser Soze doesn't exist, but I'm afraid of him'?"  VILLALOBOS responded, "Right."  CW2 continued, "Well, . . . I know [AUSA1] exists, and I'm very afraid of [him/her]." VILLALOBOS responded only by laughing.  CW2 continued, "OK?  I'm really serious about this. . . . "It's not going to do me any good, me personally, Al, any good if [AUSA1] finds out what happened here (referring to CW2 and VILLALOBOS negotiating a $100,000 payment made in exchange for VILLALOBOS' client's false statements and testimony)."  VILLALOBOS responded, "I don't know how [AUSA1 is] gonna find out."  VILLALOBOS went on further, "Yeah, I don't know how [AUSA1's] gonna find out.  Number one, there's no way I'm ever gonna say anything.  I don't see you saying anything."  CW2 interrupted and stated, "No!  No, I would not."  VILLALOBOS continued, "So I don't know how, the only person who can hurt themselves here would be [CW1]."  CW2 responded, "Well he's not going to say anything!  He's got the biggest problem of everybody (referring to CW1 being the target of a federal grand jury investigation)."  VILLALOBOS said, "So the next would be my client (Client One), and . . . I wouldn't be in the position to negotiate if my client didn't obviously have the desire to have this put behind 'em."

c.   As the conversation continued, CW2 emphasized to VILLALOBOS, ". . . if it comes out that [Client One] never got paid the first one-hundred and twenty thousand, then this whole thing comes down around us." VILLALOBOS answered, "Yeah, that will not happen." CW2 responded, "Okay, okay. And I'm saying, you know your client (asking if Client One might renege on VILLALOBOS' agreement that Client One make false statements to AUSA1 and the grand jury)." VILLALOBOS replied, "I know my client. That will not happen."

d.   VILLALOBOS then asked CW2 if he/she had verified that Witness Three and Client One were employed by the Organization at the same time, making it more plausible that Client One overheard Witness Three say that Witness Three "was out to get CW1." CW2 responded that he/she believed Client One and Witness Three had "overlapped," but that CW2 wanted to "double check."

e.   VILLALOBOS asked CW2 if CW1 and CW2 believed that the agreement should be memorialized in writing. VILLALOBOS stated, "Why would you want one at all then, if we're gonna do it this way?" CW2 asked VILLALOBOS to send him an agreement just so they could see it. VILLALOBOS responded, "Is there a way for you to leave where you are, pick something up that I can fax anonymously, and you can then throw it away?" CW2 answered affirmatively and advised VILLALOBOS, "You, you can fax it to the

FedEx/Kinko's in my building." VILLALOBOS responded, "That's a
little bit close . . . ." VILLALOBOS continued, ". . . a place
that, somewhere between . . . not directly in the line (from
CW2's office) to where you live. Give me the number . . . I'll
send it anonymously with no name . . . and you'll see it . . .
and that will be that." CW2 agreed, but informed VILLALOBOS that
he could not think of a place to which VILLALOBOS could fax the
agreement. VILLALOBOS proposed that he would fax the agreement
to the "Hollywood Kinko's" on Sunset Boulevard. Using the
Internet while still on the telephone with VILLALOBOS, CW2 found
a listing for the Kinko's and confirmed the address on Sunset
Boulevard. Later in the conversation, VILLALOBOS instructed CW2
to pick up the faxed copy of the agreement the following day
(July 28, 2009) at lunchtime under the name "Billy Bob." CW2
agreed.

       f.   In the same conversation, VILLALOBOS stated, "See,
the problem I have, . . . is this . . . the only problem or issue
I have is, if [CW1] is serious about doing this (paying
VILLALOBOS and Client One in return for Client's One's false
statements and testimony), . . . I would have to believe [CW1]
doesn't want a written agreement." CW2 answered by saying that
CW1 wants to do the deal and told VILLALOBOS that he/she (CW2)
would notify him (VILLALOBOS) by email when CW2 had the
"envelope" (containing the initial $50,000 cash payment).

VILLALOBOS answered, "It ought to be a big envelope."

22.  I have reviewed a facsimile SA Bennett retrieved on July 28, 2009, at approximately 3:45 p.m., from the FedEx/Kinko's location VILLALOBOS and CW2 had discussed the day before.  The fax was two pages in length and, handwritten on the top of the first page was: "To: Billy Bob  From: ME."  The form was a two-page settlement agreement, but did not list any names or addresses known to this investigation as related to CW1, Client One, or VILLALOBOS.  The originating fax number that was printed on the edge of both pages was an 808 area code.  SA Bennett informed me that, based on his research, he knew that the 808 area code is a Hawaii-based area code, consistent with the location in which VILLALOBOS had recently claimed to be.

23.  On July 28, 2009, at approximately 2:16 p.m., VILLALOBOS emailed CW2.  I have reviewed a report of a statement CW2 gave SA Bennett on July 30, 3009.  From these items I learned the following:

a.  In the July 28, 2009 email, VILLALOBOS asked CW2 to "Confirm receipt please" (referring to the agreement VILLALOBOS faxed to the FedEx/Kinko's location VILLALOBOS and CW2 had discussed.)  On July 28, 2009, at approximately 5:50 p.m., CW2 sent VILLALOBOS an email at the direction of the FBI.  CW2's email read, "Got it."

b.  CW2 did not call VILLALOBOS on June 29, 2009,

-28-

although he had earlier told VILLALOBOS that he would call him that day to inform VILLALOBOS that CW2 had possession of the $50,000 cash.  On July 29, 2009, at approximately 4:58 p.m., VILLALOBOS left a message on CW2's office voicemail asking CW2 to return the call.  On July 29, 2009, at approximately 7:35 p.m., VILLALOBOS then e-mailed CW2 complaining that he had not heard from CW2.  On July 29, 2009, at approximately 8:12 p.m., CW2 e-mailed VILLALOBOS stating, "The paperwork (referring to the faxed agreement) is quite different from our oral agreement," and that they might need "to talk."  VILLALOBOS e-mailed CW2 back approximately 25 minutes later and indicated that he was not satisfied with their dealings and that CW2 had "until tomorrow afternoon to let me know where we stand I cannot continue in this manner."

24.  On July 30, 3009, at approximately 4:14 p.m., at the direction of the FBI, CW2 placed a consensually recorded telephone call to VILLALOBOS' cellular telephone and left a message asking VILLALOBOS to return the call.  Approximately one minute later, CW2's receptionist informed him that he had an incoming call from VILLALOBOS.  CW2 instructed the receptionist to wait a short time and then put the call through.  The recording device was re-activated, CW2 answered the call and had a conversation with VILLALOBOS.  From a review of the recording of that conversation, I learned the following:

a.   CW2 told VILLALOBOS that he agreed with him about the "document" (referring to the agreement faxed by VILLALOBOS to the Hollywood Kinko's) and that it looked "ridiculous and we shouldn't have a document." VILLALOBOS responded, "Exactly."

b.   CW2 restated his understanding of his agreement with VILLALOBOS: "Fifty thousand dollars cash, uh . . . uh, when you get back from Hawaii (prior to Client One's meeting with AUSA1). Fifty thousand dollars cash after [Client One's] meeting with the government, assuming [Client One] says what we . . . uh, discussed (referring to Client One providing a false statement exculpating CW1)." VILLALOBOS interjected, "What we . . . think [he/she's] gonna say." CW2 asked, "Well, is there any doubt about that?" VILLALOBOS responded, "Well, no . . . no. I'm just not gonna say, ya' know, . . . we haven't seen any money. I haven't heard of the 'eagle landing' (referring to code words earlier agreed upon by CW2 and VILLALOBOS which were to be used by CW2 to inform VILLALOBOS by e-mail that CW2 had in his possession $50,000 cash to pay it over to VILLALOBOS in exchange for Client One's false statements to AUSA1), I don't know."

c.   CW2 then told VILLALOBOS not to worry about the money because CW2 had access to the cash and would "hand" VILLALOBOS the $50,000 when VILLALOBOS returned to Los Angeles. VILLALOBOS replied, "Very nice." VILLALOBOS expressed that he still had his doubts about receiving the money. CW2 reassured

-30-

VILLALOBOS by saying, "At the end of the day, Al, you're gonna have that money before you walk into the government (referring to meeting with AUSA1), okay?"  VILLALOBOS answered, "Okay."

       d.   CW2 and VILLALOBOS continued to discuss other aspects of their agreement, and CW2 complained that the document VILLALOBOS faxed anonymously differed from the terms orally agreed upon.  CW2 complained that VILLALOBOS was suddenly demanding an additional $20,000 cash payment be made to him on September 1, 2009.

       e.   CW2 reminded VILLALOBOS that he/she still feared getting into trouble with the government and he was contemplating pulling out of the deal.  VILLALOBOS answered, "It's your choice, [CW2].  I . . . I . . . I become very convinced we have a deal when I see money.  And let's be honest, that's the only thing I'm interested in this.  I don't care about any of these people.  I'm in this only for the money.  My word is gold if I see the money. I haven't seen a penny!"  CW2 responded, "Of course you haven't seen a penny 'cause you're in Hawaii!"

       f.   CW2 and VILLALOBOS continued to haggle over the terms of the agreement for Client One to provide AUSA1 with false statements that would exculpate CW1.  After some time, CW2 and VILLALOBOS agreed that CW2 would provide VILLALOBOS with $107,000 in cash, a $6,000 donation receipt from the Organization to VILLALOBOS (in exchange for a painting worth, in VILLALOBOS'

words, a "hundred bucks"), and the amount of Client One's

"salary" for one year ($24,000) from the Organization.  There was

to be no written agreement.

g.   After reaching agreement on the foregoing terms,

CW2 reiterated, "The second payment comes to you after you have

your meeting with [AUSA1]," during which Client One was to

provide false statements about his/her employment by the

Organization.  VILLALOBOS replied, "Okay."  CW2 then specified,

"Okay, and . . . and you gotta confirm to me that [Client One]

said that [he/she] didn't give it back (referring to the money

Client One had given back to CW1), blah, blah, blah . . .

everything we talked about."  VILLALOBOS agreed and stated he

would confirm with CW2 the "two key issues."  CW2 then asked

about the second "key issue."  VILLALOBOS responded by stating

the full name of Witness Three (referring to the agreement that

Client One would falsely inform AUSA1 that, while Client One and

Witness Three worked for the Organization, Client One had

overheard Witness Three state that Witness Three did not like

CW1, and that Witness Three was therefore motivated to falsely

inculpate CW1, decreasing Witness Three's credibility as a

witness against CW1).  CW2 responded, "Okay.  That's fine."

h.   CW2 then stated, "And if . . . if [AUSA1] somehow

finds out about the, about the cash (referring to the payment of

$107,000 to VILLALOBOS) . . . ."  VILLALOBOS replied, "It ain't

coming from me . . . or [Client One]." VILLALOBOS added, "My lips are sealed.  Period.  End of story."  VILLALOBOS brought up that he currently had a $1,000,000 personal injury case in which he represented Client One's spouse, so he would not do anything that could jeopardize that case, and that CW2 should not worry.

      i.   CW2 and VILLALOBOS agreed that the initial cash payment VILLALOBOS would receive be $53,500, and that the payment would be made during the week following VILLALOBOS's expected August 3, 2009 return from Hawaii.  VILLALOBOS stated, "Deal. Over.  Done with.  We will proceed."  The call ended shortly thereafter.

      25.  VILLALOBOS and CW2 coordinated the transfer of the initial $53,500 payment through an exchange of email messages on July 31, 2009.  At the direction of SA Bennett, CW2 emailed VILLALOBOS to inform him that CW2 would have to hand off the cash to VILLALOBOS on the afternoon of August 4, 2009, due to travel plans CW2 claimed to have.  CW2 wrote: "Can't we do Tuesday afternoon?  Otherwise, I may be out of town until 8/11."  Within a minute, VILLALOBOS responded, "Tuesday will do fine!"  CW2 replied, "I'm out Tuesday morning but will be back mid-afternoon. Come by [CW2's office] at 3:00 p.m."

DIGITAL DATA

      26.  Based upon my training and experience and information related to me by agents and others involved in the forensic

-33-

examination of digital devices, I know that data in digital form can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. It may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, software application or operating system that is being searched.

b. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Digital devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since digital data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the digital devices from which the data will be extracted.

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of

the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 gigabytes (GB) of data are now commonplace in desktop computers.

   d.  Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

## PROCEDURES TO MINIMIZE DISCLOSURE OF PRIVILEGED MATERIAL

27.   In identifying the items to be seized, every effort has been made to limit the scope of the requested search warrant to only those matters which relate to offense described herein.   The offenses charged and currently envisioned do not relate to VILLALOBOS' law practice, except VILLALOBOS' representation of Client One.   It is apparent, however, that the SUBJECT BLACKBERRY may contain items protected by the attorney-client privilege or the attorney work-product doctrine.   The FBI intends to attempt to image the SUBJECT BLACKBERRY shortly after it is seized, if it is possible to do so.   If it is possible to image the SUBJECT BLACKBERRY after it has been imaged.   Accordingly, I do not believe that VILLALOBOS' law practice will be severely disrupted by the seizure of the SUBJECT BLACKBERRY.   The following steps will be taken to avoid the disclosure of privileged information:

a.   The searching agents will be comprised of a group of one or more agents, including those specially trained in the forensic examination of computers, working under the direction of an FBI group supervisor.   Other than the search of the SUBJECT BLACKBERRY, the searching agents and their group supervisor will have no further role in the investigation of this matter and the case agents involved in this investigation will not participate in the search.   In addition to the search team, there will be a Privilege Assistant United States Attorney ("Privilege AUSA") who

-36-

Case 2:09-cr-00824-GHK   Document 1   Filed 08/04/09   Page 38 of 46   Page ID #:38

will be available to answer questions during the search of the
SUBJECT BLACKBERRY.  This Privilege AUSA will have no role in the
further investigation and prosecution of this case.  The
investigating case agents will not be present at the search of
the SUBJECT BLACKBERRY, and they will not participate in the
search.

      b.   The searching agents will search for the items
identified in Attachment B to the warrant.  If searching agents
find items falling within the scope of the warrant, those items
will be seized.  An inventory of everything seized will be kept
by one of the searching agents.

      c.   All items seized delivered to the Privilege AUSA.
The Privilege AUSA shall then conduct a review of all items
seized during the search.  If the Privilege AUSA determines that
the items seized are within the scope of the warrant and not
privileged, the Privilege AUSA will release the materials to the
prosecution team.  If the Privilege AUSA determines that material
is either privileged or outside the scope of the warrant, the
material will be resealed.  This determination may include a
determination as to whether the crime-fraud or other exception to
the privileges applies to an item seized.  If the crime-fraud
exception to the attorney-client privilege may apply to any item,
the Privilege AUSA (who will have no contact with the prosecution
team) will prepare an in camera, ex parte application to the

Court seeking a determination whether the exception applies.   The only evidence that will be released to the prosecution team are those items the Court determines not to be privileged.

       d.   The searching agents will determine if it is practical to make an image of all data contained on the SUBJECT BLACKBERRY at or near the time of the seizure of the SUBJECT BLACKBERRY.   If the searching agents are able to image the content of the SUBJECT BLACKBERRY, the SUBJECT BLACKBERRY will be returned to VILLALOBOS at or near the time of the completion of that imaging.   If the searching agents are unable to image the content of the SUBJECT BLACKBERRY, the SUBJECT BLACKBERRY will itself be reviewed by the searching agent pursuant to the protocol described above.   The SUBJECT BLACKBERRY will be returned to VILLALOBOS within a reasonable period of time not to exceed 60 days, unless that period is extended by a court order.

<u>CONCLUSION</u>

     40.   Based upon the foregoing, I believe that there is probable cause to believe that ALFRED NASH VILLALOBOS II has

//

//

//

//

//

//

violated 18 U.S.C. § 1503, Endeavoring to Obstruct Justice, and

that the SUBJECT BLACKBERRY contains evidence of violations of

that section.

_____
JOY MITCHELL
Special Agent
Federal Bureau of Investigation


Sworn to and subscribed before me
this 4th day of August 2009.


_____
THE HONORABLE FREDERICK F. MUMM
UNITED STATES MAGISTRATE JUDGE

ATTACHMENT A

<u>PREMISES TO BE SEARCHED</u>

The SUBJECT BLACKBERRY to be searched is described as:

One AT&T Blackberry handheld computer, linked to email address nashvilla333@yahoo.com and believed to be used by Alfred Nash Villalobos

ATTACHMENT B

ITEMS TO BE SEIZED

Based on the foregoing, I respectfully submit that there is probable cause to believe that the following items, which constitute evidence of violations of Title 18, United States Code Section 1503, will be found contained within the SUBJECT BLACKBERRY:

a.   The SUBJECT BLACKBERRY.

b.   All records, documents, programs, applications or materials, including all recoverable email, text, and voicemail messages, in sent, received, or draft form, contained on the SUBJECT BLACKBERRY, which discuss, describe, or relate to VILLALOBOS' obstruction or endeavored obstruction of justice in connection with the grand jury investigation described in this affidavit.

c.   The SUBJECT BLACKBERRY's address book, call logs, and call histories, including call logs and call histories for incoming, outgoing, and missed calls.

d.   As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form, including in digital form on any digital device, such as the SUBJECT BLACKBERRY.  The term "digital device" includes any electronic device capable of storing and/or

-1-

processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants and handheld devices; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media; and security devices.

   e. In searching for data capable of being read, stored or interpreted by a digital device, law enforcement personnel executing this search warrant will employ the following procedure, subject to the additional procedures outlined herein under the heading "Procedures to Minimize Disclosure of Privileged Material":

   i. In searching the digital device, the computer personnel may examine all of the data contained in the digital device to view their precise contents and determine whether the digital device and/or data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

   ii. The computer personnel will initially search the digital device within a reasonable amount of time not to

exceed 60 days from the date of execution of the warrant.  If, after conducting such an initial search, the case agents determine that a digital device is an item to be seized or contains any data falling within the list of items to be seized pursuant to this warrant, the government will retain the digital device for further analysis; otherwise, the government will return the digital device.  If the government needs additional time to determine whether the digital device is an item to be seized or contains any data falling within the list of items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original sixty day period from the date of execution of the warrant.

f.   In order to search for data that is capable of being read or interpreted by a digital device, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

i.   Any digital device capable of being used to commit, further or store evidence of the offense listed above;

ii.  Any equipment used to facilitate the transmission, creation, display, encoding or storage of digital data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices and optical scanners;

iii. Any magnetic, electronic or optical storage

-3-

device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones and personal digital assistants;

iv.   Any documentation, operating logs and reference manuals regarding the operation of the digital device or software used in the digital device;

v.   Any applications, utility programs, compilers, interpreters and other software used to facilitate direct or indirect communication with the digital device;

vi.   Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

vii. Any passwords, password files, test keys, encryption codes or other information necessary to access the digital device or data stored on the digital device.

Department Of Motor Vehicles Image - CALPHOTO

## CALIFORNIA DEPARTMENT OF MOTOR VEHICLES
### IMAGE RECORD FOR:

### ALFRED NASH VILLALOBOS

**C2481965**  **EXPIRES:** ████ 2010  **CLASS:** F  **SEX:** M

**HAIR:** BRN  **EYES:** BRN  **HEIGHT:** 509  **WEIGHT:** 280

**DATE OF BIRTH:** ████████

**ADDRESS:** ██████████████████

**PHOTO DATE:** 08/10/2006  **PHOTO OFFICE:** 637  **APPLICATION DATE:** 08/10/2006  **APPLICATION OFFICE:** 637

**ISSUE DATE:** N/A  **ISSUE OFFICE:** N/A  **RESTRICTIONS:** 0

SIGNATURE:





FINGERPRINT:

This photograph is **a true copy** of the photograph that is contained on the Department of Motor Vehicles photo database and delivered over the Department of Justice Cal-Photo communications network.

Date: _____ /s/ _____